UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MS. BRETT (BROOKE) SONIA[1],

           Plaintiff,

   v.

DEPARTMENT OF CORRECTIONS, *et al.*,

           Defendants.

Case No. C17-955-JLR-JPD

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff alleges in this action that defendants have violated her Eighth and Fourteenth Amendment rights by failing to properly treat her gender dysphoria. Plaintiff identifies only three defendants by name in her second amended complaint. Those individuals are Dr. Steve Hammond, Dr. Jill Barnett, and Certified Physician Assistant (PA-C) Robin Smith.[2] Plaintiff seeks injunctive relief and

---

[1] Plaintiff was convicted and sentenced under the name "Brett Sonia." However, plaintiff identifies as female and has adopted the name "Brooke Sonia."

[2] Plaintiff identified different defendants in different parts of her second amended complaint. She identified the Washington Department of Corrections and "Members Doe of Medical Review Committee" in the caption of her pleading, along with Dr. Hammond, Dr. Barnett, and PA-C Smith. (*See* Dkt. 15 at 1.) In pages

REPORT AND RECOMMENDATION
PAGE - 1

compensation for the costs of bringing this action. Defendants now move for summary judgment. Plaintiff opposes defendants' motion. The Court, having reviewed defendants' motion for summary judgment, plaintiff's response thereto, and the balance of the record, concludes that defendants' motion should be granted and that plaintiff's second amended complaint and this action should be dismissed with prejudice.

FACTS

Plaintiff Brooke Sonia is currently confined at the Stafford Creek Corrections Center in Aberdeen, Washington. Ms. Sonia is an out-of-state boarder from New Hampshire who entered Washington Department of Corrections custody on April 29, 2016. (*See* Dkt. 36, Ex. 2.) In January 2015, while still in the direct custody of the New Hampshire Department of Corrections, Ms. Sonia was referred to Dr. A. Evan Eyler, an expert in transgender healthcare, for a consultation regarding gender dysphoria. (*See id*., Ex. 1.) Dr. Eyler diagnosed Ms. Sonia as having gender dysphoria and offered some recommendations regarding treatment, with the caveat that treatment decisions would be best made through discussion with her clinicians. (*See id*., Ex. 1 at 6, 8.) Among the recommendations made by Dr. Eyler was that Ms. Sonia begin treatment with spironolactone for testosterone suppression and with medication for estrogen supplementation, and that her hormone levels and psychiatric status be monitored. (*Id*., Ex. 1 at 8.) Ms. Sonia began gender-related hormone treatment prior to her transfer into Washington Department of Corrections (DOC) custody. (Dkt. 37, ¶ 3.)

---

attached to her complaint, Ms. Sonia identified "unknown and unnamed" members of the Medical Care Review Committee and "unknown unnamed commissary managers" as defendants. (*See* Dkt. 15 at 6-7.) The Court ordered service on only the three individual defendants identified in Part III of plaintiff's second amended complaint; *i.e.*, Dr. Hammond, Dr. Barnett, and PA-C Smith, as it was not possible to serve "unknown and unnamed individuals" and it was not clear that the Washington Department of Corrections, which was identified only in the caption of the pleading and against which plaintiff asserted no specific claim for relief, was an intended defendant in this action.

When Ms. Sonia arrived at the Washington DOC in April 2016, she was initially placed at the Washington Corrections Center (WCC). (*See* Dkt. 36, Ex. 2.) She was subsequently transferred to the Monroe Correctional Complex (MCC) – Twin Rivers Unit (TRU). (*See id.*) PA-C Smith was Ms. Sonia's primary care provider at TRU from June 6, 2016, the date Ms. Sonia arrived at TRU, until July 13, 2017, the date Ms. Sonia was transferred to the MCC – Intensive Management Unit. (Dkt. 37, ¶ 2.) Ms. Sonia was transferred out of MCC in late September 2017. (*See* Dkt. 36, Ex. 2.)

PA-C Smith has some basic training in the treatment of patients who are transgendered. (Dkt. 37, ¶ 1.) PA-C Smith saw Ms. Sonia for the first time on July 11, 2016, apparently in response to a kite from Ms. Sonia requesting to see a doctor and expressing a need for gender reassignment surgery and permanent hair removal. (*See* Dkt. 36, Ex. 3 at 1; Dkt. 37, ¶ 4.) Ms. Sonia raised a number of issues during that first appointment, including lower back pain and a history of spinal fusion, asthma, and COPD. (*See id.*) She also mentioned that she had gender dysphoria and had been taking hormone medications. (*Id.*) Ms. Sonia requested that she be provided women's underwear, and she reported that women's underwear had been ordered for her at WCC. (*Id.*) PA-C Smith followed-up with MCC mental health regarding the request for women's underwear, and the request was apparently granted. (*See* Dkt. 36, Ex. 3 at 2; Dkt. 37, ¶ 4.)

In August 2016, Ms. Sonia filed a grievance requesting access to sexual reassignment surgery. (*See* Dkt. 42 at 25.) That grievance was denied and plaintiff appealed the denial to Level II of the offender grievance process. (*See id.*) According to Ms. Sonia, Superintendent Jack Warner denied the appeal "per the offender health plan." (*Id.*) Plaintiff appealed that

REPORT AND RECOMMENDATION
PAGE - 3

decision to Level III of the offender grievance process. (*See* Dkt. 42 at 25, 33.) On November 26, 2016, Assistant Secretary of Corrections Kevin Bovenkamp responded to the Level III appeal on behalf of Dr. Hammond who was the DOC Chief Medical Officer at that time. (*Id*. at 33.) Ms. Sonia was advised in the response that treatment of gender dysphoria is provided according to the DOC Gender Dysphoria Protocol, and that the protocol requires any clinical care for gender dysphoria be reviewed and approved by the Gender Dysphoria Care Review Committee (GD CRC).[3] (*Id*. at 33.) Ms. Sonia was further advised that her case had not been reviewed by the GD CRC, and that she should discuss a review request with her primary care provider and/or her primary mental health therapist. (*Id*.)

In mid-November 2016, while she was awaiting a response to her Level III grievance appeal, Ms. Sonia submitted a health services kite requesting "necessary and adequate medical care" for her gender issues, including a mammogram, blood work to assess hormone levels, and an increase in her estrogen medication. (Dkt. 36, Ex. 3 at 4.) Consistent with DOC policy, PA-C Smith directed Ms. Sonia to kite mental health as mental health practitioners typically take the lead on treatment of prisoners with gender dysphoria. (Dkt. 36, Ex. 3 at 4; Dkt. 37, ¶ 10.) In mid-December 2016, Ms. Sonia was seen by a DOC psychiatrist at which time Ms. Sonia's primary focus was on her gender dysphoria diagnosis, hormone treatments, and legal issues surrounding the treatment. (Dkt. 36, Ex. 3 at 6.) The psychiatrist indicated in her treatment notes that she would discuss Ms. Sonia's hormone treatments with the pharmacy, apparently

---

[3] The Gender Dysphoria Care Review Committee is a special Care Review Committee made up of DOC psychiatrists and mental health practitioners which deals specifically with issues related to prisoners with gender dysphoria. (Dkt. 37, ¶ 5.)

REPORT AND RECOMMENDATION
PAGE - 4

pending review of the treatment plan by the GD CRC, but she made no changes to Ms. Sonia's medication at that time. (Dkt. 36, Ex. 3 at 6.)

In January 2017, the GD CRC reviewed Ms. Sonia's hormone medications and approved the treatment of gender dysphoria, including the use of the previously prescribed hormones for testosterone suppression and estrogen supplementation. (Dkt. 37, ¶ 5.) There is nothing in the record to indicate whether the GD CRC discussed plaintiff's request for gender reassignment surgery at this time. PA-C Smith was asked to continue to supply the hormone therapy prescriptions, and to do necessary testing of Ms. Sonia's testosterone levels and monitoring of other physiological changes expected with spironolactone. (*Id.*) A test for total testosterone was conducted and the results indicated that Ms. Sonia's testosterone levels were successfully suppressed. (*Id.*) PA-C Smith communicated the results to Dr. Hammond who concluded that the treatment had been effective and that the current regimen could continue, but with annual testing of Ms. Sonia's creatinine and potassium levels. (*See id.* and Ex. 2.)

In May 2017, plaintiff sent a kite to Dr. Hammond and the GD CRC asking for an increased dosage of hormones and a "light pulse hair removal system." (*Id.*) Dr. Barnett, the Facility Medical Director at MCC, responded to the kite, advising that Ms. Sonia may be able to purchase the hair removal system through the offender paid health plan and that she should send a separate health services kite to initiate the process. (Dkt. 36, Ex. 3 at 7.) Dr. Barnett also indicated that she would order follow-up testing of Ms. Sonia's hormones and set up an appointment with her primary care provider to discuss potential changes. (*Id.*)

In June 2017, another test for total testosterone was conducted and the results indicated that Ms. Sonia's testosterone levels were hyper-suppressed, and at a level that could cause harm.

REPORT AND RECOMMENDATION
PAGE - 5

1  (Dkt. 37, ¶ 6 and Ex. 3.)  PA-C Smith consulted with Dr. Barnett, her supervising physician, who

2  advised stopping the spironolactone for a period of time and then retesting.  (Dkt. 37, ¶ 6.)  At

3  around the same time that Ms. Sonia had her blood drawn for the testing of her testosterone

4  levels in early June 2017, Ms. Sonia sent a kite to MCC medical demanding that she not be

5  placed on callout to medical "for any reason" unless she initiated the request, and claiming that

6  she would refuse any such callout.  (*See* Dkt. 36, Ex. 3 at 8; Dkt. 37, Ex. 3.)  Nevertheless, on

7  June 16, 2017, PA-C Smith called Ms. Sonia in to discuss her testosterone levels and the concern

8  that they were dangerously low.  (*See* Dkt. 37, ¶¶ 6-7 and Ex. 3.)  PA-C Smith recommended to

9  Ms. Sonia that she stop taking the spironolactone for a period of time and then be retested.  (*Id.*,

10  ¶ 7.)

11   Ms. Sonia was vehemently opposed to any reduction in the spironolactone, and became

12  threatening during the appointment with PA-C Smith, stating that they couldn't take the

13  spironolactone away and claiming that she had killed 53 people and would kill again if her

14  testosterone level were to go up and she were to "regrow[ ] manly muscles and facial hair."  (*See*

15  *id.* and Ex. 3.)  PA-C Smith stopped the interview with Ms. Sonia and thereafter sent emails to

16  Dr. Hammond, Dr. Barnett, and other members of plaintiff's treatment team, apparently seeking

17  a re-evaluation of plaintiff's treatment plan.  (*See id.*)  On the same day, Ms. Sonia submitted a

18  medical kite in which she stated that she would refuse any attempt to interfere with her hormone

19  treatments and that she "WOULD RATHER DIE than under go [sic] the treatment offered,

20  'reduction' of my spironolactone."  (Dkt. 36, Ex. 3 at 9.)

21   Ultimately, Dr. Hammond, who is an endocrinologist, made the decision to continue Ms.

22  Sonia's spironolactone because she had already been on it for a period of time.  (*See* Dkt. 37, ¶

23

REPORT AND RECOMMENDATION
PAGE - 6

1  7.)  Ms. Sonia's hormone treatment was never interrupted and her hormone medications were
2  maintained consistently while she was housed at MCC based on her own requests, and despite
3  concerns about the hyper-suppression of testosterone.  (Dkt. 37, ¶ 8.)

4  Also in June 2017, PA-C Smith submitted a request for Ms. Sonia to be provided a
5  mammogram based on her previously expressed desire for such testing.  (Dkt. 37, ¶ 9.)  Dr.
6  Barnett approved the request as medically necessary, and Ms. Sonia had a mammogram on July
7  26, 2017 which came back with no abnormal findings.  (*Id*.)

8  Ms. Sonia filed the instant action in June 2017, alleging that she was being denied
9  adequate medical care for her gender dysphoria.  (*See* Dkt. 1.)  Ms. Sonia's original and first
10 amended complaints were deficient and this Court therefore declined to serve the pleadings on
11 defendants.  (*See* Dkt. 6.)  Ms. Sonia submitted a viable second amended complaint in August
12 2017, and that is the operative pleading in this action.  (*See* Dkt. 15.)

13                                                    DISCUSSION

14  Plaintiff asserts in her second amended complaint that defendants PA-C Smith, Dr.
15 Barnett, and Dr. Hammond denied her access to adequate medical care by failing to grant her
16 direct requests for specific care and/or by failing to refer her to a specialist who could make a
17 proper diagnosis and recommend appropriate treatment for her gender dysphoria.  (*See id*. at 3,
18 9.)  Plaintiff further asserts that unnamed commissary managers/officials discriminated against
19 her by denying her access to feminine commissary and cosmetic products.  (*Id*. at 3, 10.)
20 Defendants argue that they are entitled to summary judgment with respect to all claims asserted
21 in plaintiff's second amended complaint, and they ask that plaintiff's claims be dismissed with
22 prejudice.

23

### Summary Judgment Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are facts which might affect the outcome of the pending action under governing law. *See Anderson*, 477 U.S. at 248. Genuine disputes are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id*.

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the elements essential to her case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence is insufficient to create a factual dispute. *See Anderson*, 477 U.S. at 252. In ruling on a motion for summary judgment, the court may not weigh the evidence or make credibility determinations. *Id*. at 248.

### Section 1983 Standard

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that she suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that

caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). A defendant cannot be held liable solely on the basis of supervisory responsibility or position. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691-694 (1978). Rather, a plaintiff must allege that a defendant's own conduct violated the plaintiff's civil rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-90 (1989).

DOC and Care Review Committee Members

Defendants first argue in their motion for summary judgment that the DOC and "Unknown Care Review Committee Members" are not persons under § 1983 and the claims against these defendants must therefore be dismissed. As noted above, this Court did not order service of plaintiff's second amended complaint on either the Washington DOC or unknown members of the care review committee as it wasn't clear that the DOC was an intended defendant in this action and the care review committee members were not identified with sufficient specificity to warrant service. Nevertheless, defendants' counsel returned service waivers for these two entities and, thus, the Court will address defendants' argument on summary judgment pertaining to these entities.

The United States Supreme Court has made clear that states and state agencies are not "persons" subject to suit under § 1983. *See Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). Any intended claims against the DOC are therefore clearly barred under *Will*. To the extent plaintiff asserts any claim for relief against the medical care review committee, the Court concurs with defendants' assessment that in this instance those claims appear to be simply

REPORT AND RECOMMENDATION
PAGE - 9

another way of pleading claims against the DOC.  (*See* Dkt. 15 at 6, ¶ 8.)  Such claims are also barred by *Will*.

Plaintiff argues that her claims against these defendants are not barred because she does not assert any claim for damages and, under immunity principles, claims for injunctive relief remain viable.  Plaintiff is incorrect.  As defendants correctly point out, the doctrine of Eleventh Amendment immunity is separate from the rule regarding who or what may constitute a proper defendant under § 1983.  *See Will*, 491 U.S. at 66-67.  The DOC and the medical care review committee are not persons under § 1983 and therefore may not be sued under that statute, regardless of the type of relief sought.  Any intended claims against these entities must therefore be dismissed.

<u>Claims for Injunctive Relief</u>

Defendants next argue that plaintiff's claims for injunctive relief against Dr. Barnett and PA-C Smith are mooted by her transfer from MCC.  Plaintiff requests relief in this action in the form of an order directing that her medical needs be assessed through a "specialist consult" and that defendants provide any recommended care.  (*See* Dkt. 15 at 4.)  When a prisoner is moved from one state prison facility to a different facility, any claims for injunctive relief relating to the conditions at the original facility generally become moot.  *See Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001).  Dr. Barnett and PA-C Smith are employed as health care providers at MCC.  Because plaintiff is no longer under the direct care of these individuals, her claims for injunctive relief against these defendants are, in fact, moot.

### Commissary Claims

Defendants argue that plaintiff's claims related to the denial of commissary products must be dismissed because plaintiff fails to show defendants' personal participation in the allegations related to the commissary. As noted above, plaintiff asserts that she was denied access to feminine commissary and cosmetic products by unnamed commissary managers/officials. Because these claims do not implicate the conduct of Dr. Hammond, Dr. Barnett, or PA-C Smith, all of whom are medical personnel, these claims must be dismissed.

### Medical Care Claims

Defendants argue that they are entitled to summary judgment with respect to plaintiff's claims of inadequate medical care because plaintiff has failed to show that her general treatment by the Washington DOC was medically unacceptable under the circumstances, and because plaintiff has failed to show that any of the defendants' actions were deliberately indifferent. Defendants also argue that they are entitled to qualified immunity with respect to plaintiff's medical care claims.

The treatment that a prisoner receives in prison, and the conditions under which she is confined, are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. *Id*. This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id*.

In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component. The Eighth Amendment standard

1  requires proof that (1) the alleged wrongdoing was objectively "harmful enough" to establish a
2  constitutional violation; and (2) the prison official acted with a sufficiently culpable state of
3  mind. *Farmer*, 511 U.S. at 834.

4      The objective component of an Eighth Amendment claim is "contextual and responsive
5  to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting
6  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective
7  component of the Eighth Amendment standard has been defined as "deliberate indifference" to
8  an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference"
9  standard, a prison official cannot be found liable for denying an inmate humane conditions of
10 confinement unless the official knows of and disregards an excessive risk to inmate health or
11 safety. *Id*. at 837.

12     The Ninth Circuit has explained that "[p]rison officials are deliberately indifferent to a
13 prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical
14 treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation marks
15 omitted). "[A] serious medical need is present whenever the failure to treat a prisoner's
16 condition could result in further significant injury or the unnecessary and wanton infliction of
17 pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

18     Defendants do not dispute that gender dysphoria is a serious medical need, they argue
19 only that defendants were not deliberately indifferent to that need. As noted above, defendants'
20 argument regarding the adequacy of the care plaintiff has received for her gender dysphoria is
21 presented in two parts. The Court declines to address the first part of that argument; *i.e.*, that
22 plaintiff's general treatment by the Washington DOC was medically acceptable under the
23

REPORT AND RECOMMENDATION
PAGE - 12

circumstances, because it is unnecessary to resolution of the claims asserted against the individual defendants, and because the record is not sufficiently well developed for the Court to draw any conclusions regarding the totality of the care plaintiff has received for her gender dysphoria while in Washington DOC custody.[4]

The Court notes that while the evidence in the record confirms that plaintiff continued to receive hormone therapy at times relevant to this complaint, it does nothing to illuminate other significant issues relevant to the treatment of plaintiff's gender dysphoria such as the amount of mental health care being provided, whether those providing such care have expertise in the area of gender dysphoria, whether the GD CRC has recently evaluated plaintiff and/or her desire for sexual reassignment surgery and access to a specialist, or what the gender dysphoria protocol entails. Absent more detailed evidence regarding the totality of the care plaintiff has received for her gender dysphoria, this Court cannot reach any conclusion as to whether that care was medically acceptable under the circumstances.

As to the individual defendants named in this action, PA-C Smith, Dr. Barnett, and Dr. Hammond, the Court agrees that plaintiff has failed to show that any of these individuals' actions were deliberately indifferent.[5]

   1.   *PA-C Smith*

PA-C Smith was plaintiff's primary medical provider for just over a year while plaintiff was confined at TRU. (Dkt. 37, ¶ 2.) During that time, PA-Smith maintained plaintiff's

---

[4] At defendants' request, the Court stayed discovery pending resolution of defendants' summary judgment motion because the Court deemed the record sufficient to resolve the claims specifically asserted in plaintiff's second amended complaint. (*See* Dkt. 54 at 3-4.)

[5] Because this Court concludes that plaintiff has not established any constitutional violation with respect to these three defendants, the Court need not address defendants' qualified immunity argument.

REPORT AND RECOMMENDATION
PAGE - 13

hormone treatment, followed up on plaintiff's request for a medical Health Status Report (HSR) for women's underwear, recommended that plaintiff receive a mammogram, and monitored plaintiff's hormone levels.  (*See* Dkt. 37, ¶¶ 4, 5, 6, 9.)  Though PA-C Smith did, at one point, recommend that plaintiff stop taking her testosterone suppression medication, this recommendation was clearly motivated by concerns for plaintiff's health and not by any desire to do plaintiff harm.  It is also noteworthy that when plaintiff vehemently objected to the recommendation that the spironolactone be stopped, PA-C Smith contacted Dr. Hammond who made the decision to continue the treatment.  Thus, there was ultimately no interruption in plaintiff's hormone treatment.  These facts do not demonstrate any deliberate indifference on the part of PA-C Smith.

To the extent plaintiff claims that PA-C Smith denied her access to medical care by refusing to recommend or order a specialist consult for treatment of plaintiff's gender dysphoria, plaintiff also fails to demonstrate deliberate indifference.  PA-C Smith notes in her declaration in support of defendants' summary judgment motion that mental health practitioners, not medical providers, usually take the lead on treatment of prisoner's with gender dysphoria including diagnosing a prisoner and presenting requests for hormones to the GD CRC.  (*See id.*, ¶¶ 5, 10.)  The record also makes clear that the GD CRC must review and authorize all specialized clinical care for gender dysphoria.[6]  (*See* Dkt. 36, Ex. 3 at 12.)

Plaintiff's case was presented to the GD CRC in January 2017, during the period of time plaintiff was in PA-C Smith's care, but the Committee apparently did not authorize the treatment plaintiff desires; *i.e.*, consultation with a specialist and/or gender reassignment surgery.  The

---

[6] Because PA-C Smith is a medical provider and not a mental health provider, she does not sit on the GD CRC.  (*See* Dkt. 37, ¶ 5.)

REPORT AND RECOMMENDATION
PAGE - 14

Committee's actions cannot be attributed to PA-C Smith. The Committee did generally approve treatment of plaintiff's gender dysphoria, and it specifically authorized the continuation of the hormone therapy that had been prescribed before plaintiff's entry into the Washington DOC. (Dkt. 37, ¶ 5.) PA-C Smith's assigned role in the process was to supply the hormone therapy prescriptions, to do the necessary testing of plaintiff's testosterone levels, and to monitor other physiological changes expected with the testosterone suppression medication. (*Id.*) The evidence in the record demonstrates that PA-C Smith fulfilled these obligations. Plaintiff makes no showing that the treatment provided by PA-C Smith was medically unacceptable, or that it otherwise constituted deliberate indifference. Plaintiff's claims against PA-C Smith should be dismissed.

  2.  *Dr. Barnett*

  Dr. Barnett is the Facility Medical Director at MCC, and was PA-C Smith's supervising physician. (Dkt. 37, ¶ 6.) Because PA-C Smith, and not Dr. Barnett, was plaintiff's primary care provider, Dr. Barnett's involvement in plaintiff's care was relatively limited. The record before this Court shows that Dr. Barnett responded to a medical kite submitted by plaintiff in May 2017, consulted with PA-C Smith about plaintiff's hormone treatment, and approved a request for a mammogram. (*See* Dkt. 36, Ex. 3 at 7; Dkt. 37, ¶¶ 6, 9, Ex. 3.)

  The kite to which Dr. Barnett responded contained an inquiry about plaintiff's ability to purchase a "light pulse hair removal system," and a request for an increased dosage of hormones. (Dkt. 36, Ex. 3 at 7.) Dr. Barnett provided plaintiff with information on how to pursue her request for the hair removal system, and advised plaintiff that she would order follow-up hormone testing and then set up an appointment with plaintiff's primary care provider to discuss

REPORT AND RECOMMENDATION
PAGE - 15

potential changes. (*See* Dkt. 36, Ex. 3 at 7.) It appears that it was this testing which revealed plaintiff's testosterone levels were hyper-suppressed. (*See id.*; Dkt. 37, Ex. 3.) Though Dr. Barnett did advise, when consulting with PA-C Smith, that the spironolactone be stopped, at least temporarily, the record makes clear that there was never any interruption in plaintiff's hormone therapy. (*Id.*)

Plaintiff appears to complain about the fact that Dr. Barnett was not more actively involved in her care, though at the same time she makes clear that she did not believe Dr. Barnett was qualified to diagnose or treat her gender dysphoria. (*See* Dkt. 15 at 3.) To the extent plaintiff complains that Dr. Barnett failed to recommend, or order, a consultation with a specialist, plaintiff offers no evidence that such a consultation was necessary at the time she was confined at TRU or, in any event, that she suffered any harm as a result of Dr. Barnett's failure to act. As noted above, decisions regarding clinical care for gender dysphoria are within the purview of the GD CRC and not individual providers. (*See* Dkt. 36, Ex. 3 at 12.) Plaintiff makes no showing that Dr. Barnett was deliberately indifferent to her serious medical needs and, thus, plaintiff's claims against Dr. Barnett should be dismissed.

    3.    Dr. Hammond

Finally, with respect to Dr. Hammond, the record makes clear that Dr. Hammond had little direct involvement in plaintiff's care. Dr. Hammond was involved in discussions regarding plaintiff's hormone medications on at least two occasions, though neither resulted in any denial of treatment. In fact, the second occasion was when plaintiff objected to the temporary cessation of the spironolactone and Dr. Hammond authorized the treatment to continue as plaintiff had demanded. (*See* Dkt. 37, ¶¶ 6, 7.)

REPORT AND RECOMMENDATION
PAGE - 16

Dr. Hammond's only other direct involvement in plaintiff's care was that he responded to a Level III Grievance in which plaintiff complained about the denial of her request for gender reassignment surgery. (*See* Dkt. 36, Ex. 3 at 12.) In his response, Dr. Hammond simply noted that plaintiff's case had not yet been reviewed by the GD CRC, a necessary precursor to plaintiff receiving treatment for her gender dysphoria, and advised plaintiff to discuss a review request with her primary care provider and/or her primary mental health therapist. (*See* Dkt. 36, Ex. 3 at 12.) The fact that the GD CRC, when it later reviewed plaintiff's case, failed to authorize plaintiff's desired treatment; *i.e.*, a specialist consult and/or gender reassignment surgery, cannot be personally attributed to Dr. Hammond. Plaintiff makes no showing that Dr. Hammond was deliberately indifferent to her serious medical needs and, thus, plaintiff's claims against Dr. Hammond should be dismissed.

## CONCLUSION

Based on the foregoing, this Court recommends that defendants' motion for summary judgment be granted, and that plaintiff's second amended complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **June 11, 2018**. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 15, 2018.**

REPORT AND RECOMMENDATION
PAGE - 17

This Report and Recommendation is not an appealable order. Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 21st day of May, 2018.

JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 18